IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SUZANNE P. VARITEK, | ) | Case No. 4:18-cv-1281 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Suzanne Varitek, seeks judicial review of the final decision of the

Commissioner of Social Security, denying her application for disability insurance benefits

("DIB") under Title II of the Social Security Act.  This matter is before me pursuant to 42 U.S.C.

§ 405(g) and Local Rule 72.2(b).  Because the administrative law judge ("ALJ") applied proper

legal standards and reached a decision supported by substantial evidence, I recommend that the

Commissioner's final decision denying Varitek's application for disability insurance benefits be

AFFIRMED.

## II.     Procedural History

On February 20, 2015, Varitek applied for DIB.  (Tr. 180).[1]  Varitek alleged that she

became disabled on July 1, 2014,[2] due to bipolar disorder, depression, anxiety, ADHD,

---

[1] The administrative transcript is in ECF Doc. 13.
[2] Varitek originally alleged that she became disabled on December 2, 2013, but later amended the onset date to July 1, 2014.  (Tr. 39, 180).

interstitial cystitis, and gastritis.  (Tr. 39, 62–63, 180).  The Social Security Administration denied Varitek's application initially and upon reconsideration.  (Tr. 62–93).  Varitek requested an administrative hearing.  (Tr. 124–25).  ALJ Karl Alexander heard Varitek's case on August 23, 2017, and denied her claim in a December 26, 2017, decision.  (Tr. 15–61).  On April 6, 2018, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1–6).  On June 5, 2018, Varitek filed a complaint to seek judicial review of the Commissioner's decision.  ECF Doc. 1.

### III.  Evidence

#### A.  Personal, Educational and Vocational Evidence

Varitek was born on March 17, 1962, and she was 52 years old on the alleged onset date.  (Tr. 180).  Varitek was 55 years old on the date of the ALJ's decision.  Varitek had an associate degree in business management from Kent State University.  (Tr. 41–42).  Varitek had past work as a booking agent, gymnasium manager, and customer complaint clerk.  (Tr. 27–28).

#### B.  Relevant Medical Evidence

On May 10, 2012, Varitek saw Amandeep Purewal, MD, for treatment of her mild esophagitis and mild gastritis.  (Tr. 331).  After performing an esophagogastroduodenoscopy, Dr. Purewal continued Varitek on previously prescribed medications.  (Tr. 331).  At a follow-up on April 12, 2013, Dr. Purewal noted that Varitek had increased anxiety and no relief with significant medication.  (Tr. 327).  On November 21, 2013, Dr. Purewal noted that Varitek also had a small hiatal hernia and severe abdominal pain.  (Tr. 320).  Dr. Purewal prescribed a GI medication cocktail and recommended that she have her gallbladder checked.  (Tr. 320).  On October 7, 2014, Varitek told Dr. Purewal that she had burning epigastric pain, that HyoMax gave her mild relief, and that she did not have any relief from Carafate.  (Tr. 299).  On examination, Dr. Purewal noted that Varitek had "mild" discomfort, and he continued her

2

treatment plan.  (Tr. 299).  Dr. Purewal also noted that Varitek had a mood disorder and depression.  (Tr. 299).  On April 24, 2015, Varitek told Dr. Purewal that she had "severe epigastric pain" and increased stress.  (Tr. 413).  Dr. Purewal noted that Varitek's insurance would not pay for her Carafate, diagnosed Varitek with reflux esophagitis, and prescribed medications.  (Tr. 414).  On September 2, 2015, Dr. Purewal noted that Varitek had chronic epigastric pain, severe nausea, dyspepsia, and anxiety.  (Tr. 411).  He noted that Clonazepam helped Varitek's symptoms.  (Tr. 411).  On March 18, 2016, Dr. Purewal noted that Varitek had severe depression, persistent dyspepsia, and abdominal pain, anxiety, and she was not able to get out much.  (Tr. 499).  On examination, Varitek had a regular heart rate and rhythm, clear lungs, and mild tenderness in her abdomen.  (Tr. 499).  On March 14, 2017, Dr. Purewal noted that Varitek's epigastric pain and dyspepsia improved after she ate.  (Tr. 503).  On April 10, 2017, Dr. Purewal performed an esophagogastroduodenoscopy and diagnosed Varitek with minimal esophagitis and an early hiatal hernial, but the test was otherwise "unrevealing."  (Tr. 492).

On September 26, 2013, Lester Hill, DO, evaluated Varitek after she complained that she had debilitating depression, anxiety, and gastritis.  (Tr. 357).  Dr. Hill noted that Varitek had a history of gastritis and peptic ulcer disease, depression, anxiety, continuing stomach trouble, and difficulty leaving her house.  (Tr. 357).  On October 15, 2013, Dr. Hill told Varitek that a psychologist's recommendation that she receive electroconvulsive therapy after medications did not work was "barbaric," and recommended that she could control her symptoms by eating protein and taking dietary supplements.  (Tr. 353).  On physical examination, Dr. Hill noted that Varitek had "excellent mobilization" in her back, full strength in her extremities, and several seborrheic keratoses on her shoulders that could be frozen off.  (Tr. 353, 355).  At follow-ups on January 16, February 20, and March 18 and 27, 2014, Dr. Hill continued encouraging Varitek to treat her symptoms with dietary supplements, including calamari oil, St. John's wort, and

protein. (Tr. 347–52). Dr. Hill also continued Varitek's mental health medications and recommended cryotherapy. (Tr. 347–52). On July 17, 2014, Varitek told Dr. Hill that she had bladder pain, distention, and spasms. (Tr. 345). Dr. Hill noted that Varitek was also diagnosed with interstitial cystitis, was treated for a bladder infection, and was told to follow up with urology regarding her bladder problems. (Tr. 345). Varitek also told Dr. Hill that she had low back pain after her "aggressive workout program." (Tr. 346). On October 28, 2014, Dr. Hill found that Varitek 's urinalysis was "completely negative," she had a decreased range of motion in her spine, and she had joint space narrowing between her T12 and L1 vertebrae. (Tr. 344). Dr. Hill told Varitek that wheat was "probably causing 90% of all of her problems," and advised her to pay closer attention to her diet. (Tr. 344). At follow-ups on November 25, 2014, February 16, 2015, and June 19, 2015, Dr. Hill did not note any significant changes in Varitek's condition, continued her prescription medications, and continued his recommendations that she control her symptoms through dietary supplements. (Tr. 339–40, 342).

On January 14, 2014, John Wright, MD, noted that Varitek had cyst abscesses with drainage and significant pain on her labia and mild interstitial cystitis flares. (Tr. 599). Dr. Wright drained the cyst, performed a rescue installation, and prescribed medications. (Tr. 599). On April 21, 2014, Dr. Wright noted that Varitek had a chronic UTI, installed a catheter, and drained her cyst. (Tr. 601). On April 28, 2014, and May 27, 2014, Dr. Wright noted that Varitek's interstitial cystitis was doing well, and that he again installed bladder rescues. (Tr. 603, 605). On August 19, 2014, Varitek told Dr. Wright that she had some pelvic pain, as well as frequent and urgent urination. (Tr. 607). Dr. Wright noted that Varitek's bladder was tender and that her uterus was "very irregular with multiple fibroids." (Tr. 607). On December 29, 2014, Varitek told Dr. Wright that she had increased bladder pain after drinking coffee and strong-smelling urine. (Tr. 618). Dr. Wright installed a bladder rescue, noted that

Varitek tolerated the procedure well, and instructed her on following an interstitial cystitis diet. (Tr. 618).  On January 7, 2015, Dr. Wright noted that many of Varitek's issues were likely related to her fibroid uterus, and he recommended that she have a hysterectomy.  (Tr. 619).  On May 19, 2015, Dr. Wright noted that Varitek's interstitial cystitis improved after she quit drinking diet Snapple.  (Tr. 629).  At follow-ups on September 1, 2015, and November 9, 2016, Varitek denied having any abdominal pain, swelling, difficulties or frequency urinating, walking difficulties, extremity pain, anxiety, depression, and other health symptoms.  (Tr. 634, 643–44). On January 11, 2016, Varitek told Dr. Wright that she had a flare-up with her interstitial cystitis, and Dr. Wright took a urinary sample for analysis and installed a bladder rescue.  (Tr. 637).  On January 20 and 27, 2016, Varitek stated that she took her medications and that her rescue treatments improved her symptoms.  (Tr. 639, 641).  On March 1, 2017, Dr. Wright noted that Varitek was "doing well" after a bladder rescue.  (Tr. 649).

On April 29, 2014, Virginia Daley, CRNP, evaluated Varitek.  (Tr. 369–71).  On examination, Daley noted that Varitek had an appropriate affect, normal thought content, rapid thought process, intact judgment, intact memory, normal attention, and normal concentration. (Tr. 370).  Daley diagnosed Varitek with mood disorder and major depressive disorder, and she scheduled Varitek to see a therapist.  (Tr. 371).

On August 24, 2014, Varitek saw William Price, MD, for an initial psychiatric evaluation.  (Tr. 406–09).  Varitek reported that she had chronic bipolar disorder, depression, and ADD, and that her doctors got mad at her because she was noncompliant with treatment. (Tr. 406).  On examination, Dr. Price noted that Varitek had obsessive, racing, and logical thoughts, as well as impaired attention/concentration.  (Tr. 407–08).  Dr. Price prescribed medications to treat her symptoms.  (Tr. 409).  Between September 10, 2014, and April 25, 2017, Varitek saw Dr. Price for 26 follow-up medication management sessions.  (Tr. 386–405, 418–28,

560–63, 578–81, 586–89).  On October 22, 2014, November 5, 2014, March 4, 2015, and March

14, 2017, Dr. Price noted that Varitek stopped taking her prescribed medication due to adverse

side effects and adjusted her prescriptions.  (Tr. 393, 400–01, 578).  On October 22, 2014, Dr.

Price encouraged Varitek to get therapy; however, on December 23, 2014, he noted that Varitek

resisted his therapy recommendations.  (Tr. 397).  On March 2, 2016, Dr. Price noted that

Varitek was "treatment resistant."  (Tr. 425–28).  On April 25, 2017, Dr. Price noted that Varitek

continued to have major anhedonia, depression, dysthymia, and a global assessment of

functioning score between 55 and 58.[3]  (Tr. 587).

On October 3, 2014, Thomas Neis, MD, took images of Varitek's back and found that

there was slight narrowing of the T12-L1 disc space, but her back was otherwise normal.

(Tr. 362).  Varitek's neck was also normal.  (Tr. 363).  An ultrasound of Varitek's pelvis showed

three uterine fibroids and an ovarian cyst.  (Tr. 663).  Gary Loh, MD, interpreted an ultrasound

of Varitek's kidneys and determined that there was small post void residual and a small left renal

cyst, but her kidneys were "otherwise unremarkable."  (Tr. 665).

On April 2, 2015, Elizabeth Slater, NP, performed a bladder rescue, and Varitek

complained about urinary frequency, urgency, and pressure.  (Tr. 623).  On examination, Slater

noted that Varitek appeared normal, was alert and oriented, had intact cognitive function, and

had good judgment and insight.  (Tr. 624).

On April 28, 2016, Varitek saw Kelly Scott, CNP, for medication management.

(Tr. 430–33).  Varitek told Scott that she had "some benefits" from her medications and felt

"very good" for five days, but she generally had no energy and no motivation, did not leave the

---

[3] The global assessment of functioning is a scale used to report an individual's overall functioning at a
particular point in time.  AM. PSYCH. ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL
DISORDERS 30 (4th ed. 2000).  A score in the range of 51 to 60 indicates "moderate symptoms (e.g., flat
affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupation,
or school functioning (e.g., few friends, conflicts with peers or co-workers)."  *Id.*

house, cried easily, and had to have people shop for her.  (Tr. 430).  Scott discussed changing

Varitek's medication.  (Tr. 433).  On May 26, 2016, Varitek told Scott that she was feeling

better, but wanted to try new medications.  (Tr. 441).  On June 28, 2016, Scott noted that Varitek

was doing well and improved her motivation and mood with medications.  (Tr. 451).  On August

25, 2016, Varitek told Scott that her Adderall did not help with her concentration, but she did not

have any anxiety.  (Tr. 466).  On September 20, 2016, Scott noted that Varitek had notable

changes in her mood and thought process, she felt like a failure after moving back into her dad's

house, and she had flight of ideas.  (Tr. 487).  On October 4, 2016, Varitek told Scott that she

started picking up performance gigs, felt like her mood was stable, and believed her anxiety was

controlled with her medications.  (Tr. 510).  On January 17, 2017, Varitek told Scott that her

medication made her sleep too much and that one of her antipsychotics "stopped working."

(Tr. 548).  Scott referred Varitek to Dr. Price for medication adjustment.  (Tr. 552).  On February

2, 2017, Varitek again told Scott that her medication wasn't helping.  (Tr. 565).

On September 13, 2016, Varitek saw Mallory Wines, LPC, for a counseling intake

evaluation.  (Tr. 476–85).  Wines noted that Varitek was diagnosed with PTSD, dysthymia,

bipolar disorder, and depression.  (Tr. 476).  Wines also noted that Varitek had anxiety and felt

hopeless.  (Tr. 476).  On examination, Wines noted that Varitek was responsive and had clear

speech, logical thought process, average intelligence, and good insight/judgment.  (Tr. 481).

Wines noted that Varitek was irritable, isolated herself from others, and needed to develop

coping skills.  (Tr. 483–84).  On December 6, 2016, Wines noted that Varitek made "some

progress," tried to keep busy, and applied to jobs.  (Tr. 536, 538).  On December 13, 2016, Wine

noted that Varitek got out of the house more often, got singing gigs, and had an improved mood.

(Tr. 545, 547).  On January 5, 2017, Varitek told Wines that she continued to feel depressed, but

continued getting performance gigs and acknowledged her self-worth.  (Tr. 554).  On January 17,

2017, Wines noted that Varitek had anhedonia and difficulty getting out of bed. (Tr. 557). On April 11, 2017, Varitek told Wines that she found her chiropractic sessions helpful. (Tr. 583).

On September 26, 2016, Varitek saw Brian Szelc, NPC, for back pain. (Tr. 505). Varitek rated her pain as a 7/10, and she said extension and walking aggravated it and that ice relieved it. (Tr. 505). On examination, Szelc noted that there was tenderness in Varitek's spine, but her gait and extremities were normal. (Tr. 508).

On January 9, 2017, Varitek saw Peter Lawton, DC, for treatment of pain in her neck, hips, lower back, and shoulder. (Tr. 669). Varitek told Dr. Lawton that her pain caused difficulty with standing, bending, exercising, sleeping, grocery shopping, sitting, and using her computer. (Tr. 669). On examination, Dr. Lawton determined that Varitek's touch and vibration sensations, reflexes, and resistive isometric motor testing were normal. (Tr. 670). Varitek had a normal gait, normal balance, and moderate to severe muscle spasms. (Tr. 670). Dr. Lawton diagnosed Varitek with cervicalgia, headaches, low back pain, and segmental and somatic dysfunction of the cervical, head, lumbar, sacral, and pelvic regions. (Tr. 671). Dr. Lawton recommended that Varitek use ice to reduce her pain and 6 weeks of chiropractic manipulative therapy. (Tr. 671). At a follow-up on January 17, 2017, Dr. Lawton noted that Varitek was asymptomatic and did not complain about musculoskeletal pain. (Tr. 673). On February 16, 2017, Varitek told Dr. Lawton that she had 4/10 pain in her trapezius, which she said decreased with rest. (Tr. 677). On April 11, 2017, Varitek complained that she had aching and tightness in her lower back and discomfort in her left shoulder, both of which decreased with rest and ice. (Tr. 678). On April 25, 2017, Dr. Lawton noted that Varitek did not report any pain, had normal muscle tone, and had normal range of motion without pain. (Tr. 680). On July 6, 2017, Dr. Lawton issued a report indicating that Varitek "underwent a series of physical assessments to determine the state of core neurological and spinal functions" on January 9, 2017. (Tr. 681).

8

The report indicated that Varitek had good muscle tone and balance, good spinal motion, and challenged organ and gland control.  (Tr. 681).

### C.    Relevant Opinion Evidence

#### 1.    Treating Psychiatrist – William Price, MD

On March 14, 2017, Dr. Price completed a functional assessment checklist.  (Tr. 692). On the checklist, Dr. Price indicated that Varitek could not "meet competitive standards" with regard to her abilities to: (1) remember work-like procedures; (2) maintain attention for two hours; (3) maintain regular attendance and be punctual within customary tolerances; (4) sustain an ordinary routine without special supervision; (5) work in coordination with or proximity to others without being unduly distracted; (6) complete a normal workday and workweek without interruptions from psychologically based symptoms; (7) perform at a consistent pace without an unreasonable number and length of rest periods; (8) accept instructions and respond appropriately to criticism from supervisors; (9) get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; (10) respond appropriately to changes in a routine work setting; and (11) deal with normal work stress.  (Tr. 692).  Dr. Price also indicted that Varitek was seriously limited in her abilities to understand and remember very short and simple instructions, carry out very short and simple instructions, make simple work-related decisions, ask simple questions or request assistance, and be aware of normal hazards and take appropriate precautions.  (Tr. 692).  He also indicated that Varitek's impairments would cause her to be absent from work more than four days per month.  (Tr. 692).  Dr. Price explained that Varitek's functional limitations were based on her major depressive disorder, attention deficit disorder, and generalized anxiety disorder.  (Tr. 692).

## 2. Consultative Examiner – David Bousquet, M.Ed.

On June 24, 2015, David Bousquet, M.Ed., conducted a psychological evaluation on referral from the Ohio Division of Disability Determination.  (Tr. 377–85).  Varitek told Bousquet that she did not have any difficulties relating to community members, coworkers, or supervisors.  (Tr. 379).  She said she had depression, cried, and was angry sometimes; however, her psychotropic medications helped her symptoms and she was not anxious.  (Tr. 379).  Varitek said that she had difficulty sleeping and getting out of bed, had to use the restroom frequently, snapped at other people when angry, and had low motivation and self-esteem.  (Tr. 379–80).  Varitek said that, on a typical day, she took care of her three cats, tried to do chores, cleaned, rarely cooked, did laundry, watched TV, wrote horror and romance articles, and visited with her friend, sister, dad, and dad's girlfriend.  (Tr. 380).

On examination, Bousquet noted that Varitek was cooperative, understandable, organized, and did not show any signs of anger or irritability.  (Tr. 381).  Varitek was easily distracted, restless, and fidgety.  (Tr. 381).  She had average cognitive abilities and no indications of thought disorders, delusional thinking, obsessions, or compulsions.  (Tr. 381–82).  Her insight and judgment were appropriate, but could be influenced by her psychological functioning.  (Tr. 382).  Bousquet noted that Varitek could participate in decisions affecting the future and conduct her own living arrangements.  (Tr. 382).  Bousquet diagnosed Varitek with Bipolar I and ADHD.  (Tr. 382).

In assessing Varitek's functional limitations, Bousquet stated that Varitek could understand, remember, and carry out instructions in a workplace.  (Tr. 383).  Bousquet stated that Varitek would have difficulties with maintaining attention, concentration, persistence, and pace in a work setting; however, she could engage in simple and multi-step tasks.  (Tr. 383).  Varitek would have "times [when she will have some difficult[y with her] abilit[y] to conform to social

expectations in a work setting," but she did not have difficulty relating to others.  (Tr. 383).
Bousquet stated that Varitek would have difficulty responding appropriately to workplace stress
and pressure, due to her anxiety and anger issues.  (Tr. 383–84).

### 3.    State Agency Consultants' Opinions

On May 6, 2015, state agency consultant James Cacchillo, DO, evaluated Varitek's
physical limitations based on a review of her medical records.  (Tr. 69–72, 75).  Dr. Cacchillo
noted that Varitek had the severe physical impairments of gastritis, duodenitis, and interstitial
cystitis.  (Tr. 69).  Dr. Cacchillo noted that Varitek's subjective complaints regarding her pain
were "partially credible" because medical evidence showed "mild chronic gastritis and H. pylori
negative[, and e]xams show[ed] abdomen soft."  (Tr. 71).  Dr. Cacchillo opined that Varitek
could lift and/or carry up to 50 pounds occasionally and 25 pounds frequently; stand and/or walk
for up to 6 hours in an 8-hour workday; and sit for up to 6 hours in an 8-hour workday.  (Tr. 71–
72).  Varitek did not have any limitations to pushing and/or pulling, posture, manipulation,
vision, communication, or environment.  (Tr. 72).  Dr. Cacchillo opined that Varitek could
perform a range of medium work.  (Tr. 75).  On October 18, 2015, Lynne Torello, MD, reviewed
Varitek's medical records and concurred with Dr. Cacchillo's opinion.  (Tr. 84, 86–87, 90).

On June 29, 2015, state agency consultant Juliette Savitscus, Ph.D., evaluated Varitek's
mental limitations based on a review of her medical records.  (Tr. 69–74).  Dr. Savitscus noted
that Varitek had the severe impairments of affective disorders, anxiety disorders, and
ADD/ADHD.  (Tr. 69).  Varitek's mental impairments caused "moderate" limitations in daily
living activities, maintaining social functioning, and maintaining concentration, persistence, and
pace.  (Tr. 69).  Dr. Savitscus noted that Varitek's subjective complaints regarding her inability
to concentrate and function around others were inconsistent with her reports of being able to
watch TV movies, prepare meals, write articles, manage her own affairs, grocery shop, keep

appointments, talk with her friends and relatives, and be polite and conversational at examinations.  (Tr. 71).  Dr. Savitscus opined that Varitek was "not significantly limited," or showed no evidence of a limitation, in her ability to: (1) carry out very short and simple instructions; (2) perform activities without a schedule, maintain regular attendance, and be punctual within customary tolerances; (3) sustain an ordinary routine without special supervision; (4) work in coordination with or in proximity to others without being distracted by them; (5) make simple work-related decisions; (6) ask simple questions or request assistance; (7) accept instructions and respond appropriately to criticism from supervisors; (8) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior; (9) adhere to basic standards of neatness and cleanliness; (10) be aware of normal hazards and take appropriate precautions; (11) travel in unfamiliar places or use public transportation; and (12) set realistic goals or make plans independently of others.  (Tr. 73–74).  Varitek had "moderate" limitations in her ability to: (1) carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) complete a normal workday and workweek without interruptions from psychologically based symptoms; (4) perform at a consistent pace without an unreasonable number and length of rest periods; (5) interact appropriately with the general public; and (6) respond appropriately to changes in the work setting.  (Tr. 73–74).  Dr. Savitscus explained that Varitek's moderately limited ability to complete a normal workday and workweek was caused by her ADD and depressive symptoms.  (Tr. 73).  Dr. Savitscus noted that Varitek could "carry out routine tasks to completion with consistent but not fast pace[, but she w]ould not work effectively under quotas or deadlines."  (Tr. 73).  On October 20, 2015, Vicki Warren, Ph.D., reviewed Varitek's medical records and concurred with Dr. Savitscus' opinion.  (Tr. 84–89).

### D.    Relevant Testimonial Evidence

Varitek testified at the ALJ hearing.  (Tr. 39–57).  Varitek stated that she lived off a 401k and $500 monthly alimony payments, but her alimony payments would stop in December 2017.  (Tr. 40–41).  She lived with her elderly dad and did "basic things" to care for him, including making dinner and shopping.  (Tr. 41).  Varitek stated that she was in bed 80% of the day and went out only once a week.  (Tr. 47).  Varitek could not say how long she could stand without changing positions, but she did not have any trouble sitting.  (Tr. 55–56).  She could lift a bucket of water.  (Tr. 56).

Varitek testified that she last worked as a customer service agent for a shipping company from 2010 to 2014.  (Tr. 42–43).  She sat for most of her customer service job, answered customer phone calls, and did not lift anything.  (Tr. 43).  Varitek also worked as an entertainment booker for a casino, a gym manager, and an airline reservation sales agent.  (Tr. 43–44).  As a gym manager, Varitek was on her feet all day, hired and fired employees, made schedules, and lifted buckets of water to clean machines.  (Tr. 44–45).

Varitek testified that she could no longer work because her depression, anxiety, ADHD, and physical symptoms bothered her every day and made holding onto jobs difficult.  (Tr. 46–47).  She said that she had to use the restroom often and could not pay attention.  (Tr. 47).  Varitek said that she had not found any medications, refused her physician-recommended electroshock therapy, unsuccessfully tried ketamine therapy, and did not have any relief using electrical stimulation head pads that her dad bought her.  (Tr. 48).  She started seeing a new psychiatrist a couple months before the hearing.  (Tr. 48).  Varitek said she was never hospitalized for her mental symptoms.  (Tr. 48).  Varitek said that she had stomach and bladder issues, which caused pain and feelings of fullness.  (Tr. 51, 54–55). She had to use the restroom

every 15 or 20 minutes.  (Tr. 51).  Varitek took several medications to help with her mental and

physical problems, and she did not experience any side effects.  (Tr. 52–53).

Linda Dezack, a vocational expert ("VE"), also testified.  (Tr. 57–61).  The ALJ asked

the VE whether a hypothetical individual with Varitek's age, education, and experience could

work at the medium exertional level if she:

> could not climb ladders, ropes, or scaffolds.  Should have no concentrated
> exposure to temperature extremes, environmental pollutants, or hazards.  Should
> work in a low stress environment with no – with no production line, assembly line
> type of pace.  No independent decision-making responsibilities and minimal
> changes in the daily work routine.  Would at this time be limited to unskilled
> work involving only routine and repetitive instructions, tasks, and should have no
> interaction with the general public and no more than occasional interaction with
> coworkers and supervisors.

(Tr. 58–59).  The VE stated that such an individual could work as a kitchen helper, machine

packager, and cleaner II.  (Tr. 59).  On examination by Varitek's attorney, the VE stated that he

could not identify any work that would be available to the above-described individual if she were

also likely to be absent from work more than twice a month.  (Tr. 60).  The VE also testified that

the individual described in the ALJ's hypothetical could not work if she were "off task more than

20% of the time due to a variety of issues."  (Tr. 60).  The VE testified that employers would

tolerate up to three breaks during the workday.  (Tr. 60).

## IV.    The ALJ's Decision

The ALJ's December 26, 2017, decision found that Varitek was not disabled and denied

her application for DIB.  (Tr. 18–30).  The ALJ found that Varitek met the insured status

requirements through December 31, 2017, and had not engaged in substantial gainful activity

since July 1, 2014.  (Tr. 20).  The ALJ found that Varitek had the severe impairments of:

interstitial cystitis, major depressive disorder, mood disorder, bipolar disorder, and ADHD.

(Tr. 20).  The ALJ found that had the nonsevere impairments of:

> slight narrowing of the T12-S1 disc space, thoracic myalgia, lumbago, seborrheic keratosis of the shoulder and wrist, minimal to mild esophagitis, mild gastritis, mild inflammatory disease of the stomach, slight prominence of the spleen, small left renal cyst, inflammatory bowel disease, vaginitis, right ovarian cyst, and hypertension.

(Tr. 21). The ALJ noted that, although Varitek's nonsevere impairments would have no more than a minimal effect on her ability to perform basic work activities, their combination with Varitek's other impairments could cause additional limitations. (Tr. 21). Thus, the ALJ "considered [Varitek's] nonsevere impairments in formulating her residual functional capacity." (Tr. 21). The ALJ also determined that Varitek did not have any impairment, or combination of impairments, that met or medically equaled the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 21–24).

> The ALJ determined that Varitek had the RFC to perform medium work, except that:

> she cannot climb ladders, ropes or scaffolds. The claimant should avoid concentrated exposure to temperature extremes, environmental pollutants, and hazards. The claimant should work in a low-stress environment with no production line or assembly line type of pace. The claimant should have no independent decision-making responsibilities and should have minimal changes in the daily work routine. The claimant is limited to unskilled work involving only routine and repetitive instructions and tasks. The claimant should have no interaction with the general public and no more than occasional interaction with co-workers and supervisors.

(Tr. 24). The ALJ stated that, in assessing Varitek's RFC, he "considered all symptoms" in light of the medical and other evidence in the record. (Tr. 24).

> The ALJ noted that, despite her impairments, Varitek "remain[ed] active and perform[ed] a number of work like activities," including taking care of her elderly father and "regularly" working as an entertainer/celebrity impersonator. (Tr. 25). The ALJ noted that Varitek's interstitial cystitis and fibroids caused her to use the restroom "quite a bit," but that she told her physicians her medications and bladder rescue treatments were effective. (Tr. 25). The ALJ also noted that Varitek had a normal gait, had normal mother strength, and denied walking difficulty.

(Tr. 25).  Furthermore, the ALJ noted that Varitek no longer sought treatment for any of her mental impairments, was noncompliant with medications, and told her doctors that her symptoms did not interfere with her daily functioning.  (Tr. 25).

The ALJ stated that he gave "great weight" to Dr. Cacchillo's and Dr. Torello's opinions that Varitek could perform a range of medium work, and "little weight" to Dr. Wright's, Dr. Purewal's, and Dr. Lawson's opinions that Varitek could perform only a range of sedentary work.  (Tr. 25–26).  The ALJ also stated that he gave "significant weight" to Dr. Savitscus' and Dr. Warren's opinions regarding Varitek's mental limitations.  (Tr. 26).  The ALJ gave "great weight" to Bousquet's opinion, because it was "reasonable and consistent with treatment notes and the statements made by [Varitek] throughout the record."  (Tr. 26).  The ALJ specifically noted that Bousquet found that, despite Varitek's "difficulty in concentration and pace[,] she has the capacity to engage in both simple and multistep instructions."  (Tr. 26).  The ALJ gave "little weight" to Dr. Price's opinion.  (Tr. 27).  The ALJ explained that Dr. Price's opinion was a "checklist-style form [that] appear[ed] to have been completed as an accommodation to the claimant and include[d] only conclusions regarding function limitations without any rationale for those conclusions."  (Tr. 27).  Further, the ALJ stated that "the objective evidence does not support [Dr. Price's opinion] for the reasons explained above."  (Tr. 27).

Based on Varitek's RFC, the ALJ found that she could no longer perform any of her past relevant work as a booking agent, gymnasium manager, or customer complaint clerk.  (Tr. 27–28).  Because the ALJ found that Varitek was unable to perform all or substantially all of the requirements of medium work, he relied on the VE's testimony to determine whether Varitek could perform a significant number of jobs at the medium exertional level with additional limitations.  (Tr. 28–29).  Based on the VE's testimony and considering Varitek's RFC, age, education, and experience, the ALJ found that Varitek could work as a kitchen helper, machine

16

packager, or cleaner II.  (Tr. 28–29).  In light of his findings, the ALJ determined that Varitek

was not disabled "from December 2, 2013, through the date of [his] decision."  (Tr. 29).

## V.    Law & Analysis

### A.    Standard of Review

The court's review is limited to determining whether the ALJ applied proper legal

standards and reached a decision supported by substantial evidence.  42 U.S.C. § 405(g); *Elam v.*

*Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003).  Substantial evidence is any relevant

evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a

conclusion.  *Rodgers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Under this standard of review, a court cannot decide the facts anew, make credibility

determinations, or re-weigh the evidence.  *See* 42 U.S.C. § 405(g) (providing that, if the

Commissioner's findings as to any fact are supported by substantial evidence, those findings are

conclusive); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) ("Upon review, we

are to accord the ALJ's determinations of credibility great weight and deference particularly

since the ALJ has the opportunity, which we do not, of observing a witness's demeanor when

testifying.").  Even if the court does not agree with the Commissioner's decision, or substantial

evidence could support a different result, the court must affirm if the Commissioner's findings

are reasonably drawn from the record and supported by substantial evidence.  *See Elam*, 348

F.3d at 125 ("The decision must be affirmed if the administrative law judge's findings and

inferences are reasonably drawn from the record or supported by substantial evidence, even if

that evidence could support a contrary decision."); *Rogers*, 486 F.3d at 241 ("[I]t is not necessary

that this court agree with the Commissioner's finding, as long as it is substantially supported in

the record.").  This is so because the Commissioner enjoys a "zone of choice" within which to

decide cases without risking being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Though the court's review is deferential, the court will not uphold the Commissioner's decision if the ALJ failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, however, we review decisions of administrative agencies for harmless error. Accordingly, . . . we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (citations and quotation omitted)). Furthermore, the court will not uphold a decision, even when supported by substantial evidence, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to supplemental security income or disability benefits: (1) whether

the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy.  20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006).  The claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled and, thus, entitled to benefits.  20 C.F.R. § 404.1512(a).

### B.  Severe Impairments

Varitek argues that the ALJ erred by failing to explain his finding that her slightly narrowed T12-S1 disc space, thoracic myalgia, lumbago, seborrheic keratoses of the shoulder and wrist, mild esophagitis, mild gastritis, mild inflammatory stomach disease, slight spleen prominence, small left renal cyst, inflammatory bowel disease, vaginitis, right ovarian cyst, and hypertension were not severe impairments.  ECF Doc. 14 at 17–20.  Varitek asserts that, although the ALJ stated that he considered all of Varitek's impairments in evaluating her RFC, the ALJ's failure to consider the above impairments to be severe was not harmless because the RFC does not contain limitations accounting for those impairments.  *Id.* at 18–19.  Varitek asserts that, because evidence supported a finding that the above impairments significantly limited her ability to work, the ALJ was required to find them severe.  *Id.* at 17–20.

The Commissioner responds that the ALJ reasonably determined that only Varitek's interstitial cystitis was severe, and that any alleged error in finding her other impairments non-severe is harmless because the ALJ continued in the sequential evaluation process.  ECF Doc. 15 at 6–7.

At the second step of the sequential analysis, the ALJ considers whether the claimant has a "severe impairment." 20 C.F.R. § 404.1520(a)(4)(ii), (c). Step Two is a threshold inquiry "intended to 'screen out totally groundless claims.'" *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576 (6th Cir. 2009) (quoting *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985)). The Sixth Circuit has applied a *de minimis* standard to the Step Two inquiry, meaning that the ALJ must find that a claimant's medically determinable impairment is severe, so long as it has more than a minimal effect and would be expected to interfere with the individual's ability to work. *See Salmi v. Sec'y of Health & Human Servs.*, 744 F.2d 685, 691 (6th Cir. 1985) ("'An impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work.'" (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984))). If the ALJ determines that the claimant does not have a severe impairment, or combination of impairments, the regulations direct the ALJ to find that the claimant is not disabled. 20 C.F.R. § 404.1520(c). However, "[a]fter an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider limitations and restrictions imposed by *all* of an individual's impairments, even those that are not 'severe.'" *Nejat*, 359 F. App'x at 577 (quoting SSR 96-8p, 61 Fed. Reg. 34474, 34477 (Jul. 2, 1996)). So long as the ALJ considers all the claimant's impairments – severe and non-severe – in the remaining steps of the disability determination, any error at Step Two is harmless. *Nejat*, 359 F. App'x at 577 (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).

The ALJ applied proper legal standards in evaluating the severity of Varitek's impairments at Step Two. Here, the ALJ adequately explained that Varitek's slightly narrowed T12-S1 disc space, thoracic myalgia, lumbago, seborrheic keratoses of the shoulder and wrist, mild esophagitis, mild gastritis, mild inflammatory stomach disease, slight spleen prominence,

20

small left renal cyst, inflammatory bowel disease, vaginitis, right ovarian cyst, and hypertension were not "severe impairments," because they had no more than a minimal effect on her ability to work. *Salmi*, 744 F.2d at 691; (Tr. 21).  Moreover, even if the ALJ erred in finding that the above impairments were not severe, any alleged error in the ALJ's non-severity finding was harmless because the ALJ proceeded to the next steps in the sequential evaluation and considered all of Varitek's severe and nonsevere impairments.  *Nejat*, 359 F. App'x at 577; *Maziarz*, 837 F.2d at 244; SSR 96-8p, 61 Fed. Reg. at 34477; (Tr. 21–27).  I recommend that the court affirm the Commissioner's determination that the above impairments were nonsevere.

### C.  Treating Physician Opinion

Varitek argues that the ALJ erred by not giving Dr. Price's opinions controlling weight. ECF Doc. 14 at 6.  Varitek asserts that the ALJ's reasons for rejecting Dr. Price's opinion – that it was inconsistent with other evidence in the record, was on a checklist form, and did not explain the functional limitation findings – were not "good reasons."  *Id.* at 8.  Varitek also contends that the ALJ did not give "good reasons" for rejecting Dr. Price's opinion, because the ALJ did not discuss any of the 20 C.F.R. § 404.1527(c) factors.  *Id.* at 9–10.  Finally, Varitek contends that substantial evidence did not support the ALJ's conclusion that Dr. Price's opinion was inconsistent with the evidence, because other medical evidence supported Dr. Price's opinion.  *Id.* at 8–10.

The Commissioner responds that the ALJ provided good reasons for rejecting Dr. Price's opinion, including that the opinion was a conclusory checklist form, did not explain Dr. Price's findings, and was inconsistent with other evidence in the record.  ECF Doc. 15 at 16–18.  The Commissioner asserts that the regulations did not require the ALJ to include an exhaustive, factor-by-factor analysis in his discussion.  *Id.* at 17.  Furthermore, the Commissioner argues that

21

substantial evidence supported the ALJ's conclusion that Dr. Price's opinion was inconsistent with other evidence in the record.  *Id.* at 18.

Varitek's reply brief reiterates her arguments that the ALJ did not provide good reasons for rejecting the ALJ's opinion.  ECF Doc. 16 at 2–3.  Varitek adds that the ALJ's conclusory statement that Dr. Price's opinion was inconsistent with the record evidence was insufficient, and that the ALJ was required to make "some effort to identify the specific discrepancies" between the record evidence and Dr. Price's opinion.  *Id.* at 3.

At Step Four, an ALJ must weigh every medical opinion that the Social Security Administration receives.  20 C.F.R. § 404.1527(c).  An ALJ must give a treating physician's opinion controlling weight, unless the ALJ articulates good reasons for discrediting that opinion. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).  "Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'"  *Id.*  (quoting 20 C.F.R. § 404.1527(c)(2)).  Good reasons for rejecting a treating physician's opinion may include that: "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  *See Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (quotation omitted); 20 C.F.R. § 404.1527(c).  Inconsistency with nontreating or nonexamining physicians' opinions alone is not a good reason for rejecting a treating physician's opinion.  *See Gayheart*, 710 F.3d at 377 (stating that the treating physician rule would have no practical force if nontreating or nonexamining physicians' opinions were sufficient to reject a treating physician's opinion).

If an ALJ does not give a treating physician's opinion controlling weight, he must nevertheless determine the weight it is due by considering the length of the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist.  *See Gayheart*, 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2)–(6).  Nothing in the regulations requires the ALJ to explain how he considered each of the factors.  *See* 20 C.F.R. § 404.1527(c); *see also Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804–05 (6th Cir. 2011) (noting that the regulations do not require "an exhaustive factor-by-factor analysis").  Nevertheless, the ALJ must provide an explanation "sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight."  *Gayheart*, 710 F.3d at 376; *see also Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight he actually assigned.").  When the ALJ fails to adequately explain the weight given to a treating physician's opinion, or otherwise fails to provide good reasons for rejecting a treating physician's opinion, remand is appropriate.  *Cole*, 661 F.3d at 939.

The ALJ applied proper legal procedures in evaluating Dr. Price's opinions concerning Varitek's functional limitations.  42 U.S.C. § 405(g); *Elam*, 348 F.2d at 125.  Here, the ALJ complied with the regulations by explicitly considering Dr. Price's opinion in light of the evidence as a whole and stating that he gave "little weight" to Dr. Price's opinion.  *Gayheart*, 710 F.3d at 376; 20 C.F.R. § 404.1527(c); (Tr. 27).  Even assuming that the checklist format of Dr. Price's opinion was not a good reason for rejecting Dr. Price's opinion, the ALJ gave other sufficient reasons for rejecting Dr. Price's opinion when he explained that it was inconsistent with other evidence in the record and conclusory.  *Gayheart*, 710 F.3d at 376; *Winschel*, 631

23

F.3d at 1179; 20 C.F.R. § 404.1527(c); (Tr. 27).  Furthermore, the ALJ was not required to

provide an "exhaustive factor-by-factor analysis" in weighing Dr. Price's opinion, as he gave

sufficient explanation for a subsequent reviewer to understand the weight he gave Dr. Price's

opinion and the reasons for that weight.  20 C.F.R. § 404.1527(c); *Francis*, 414 F. App'x at 804–

05; *Gayheart*, 710 F.3d at 376; *Cole*, 661 F.3d at 938; (Tr. 27).

> Substantial evidence also supported the ALJ's decision to give Dr. Price's opinion little

weight.  42 U.S.C. § 405(g); *Elam*, 348 F.2d at 125.  Evidence in the record supported the ALJ's

conclusion that Dr. Price's opinion was inconsistent with evidence in the record, including:

(1) Varitek's own reports that she could take care of cats, do chores, watch TV, write horror and

romance articles, visit with her friends and family members, and did not have trouble interacting

with other people; (2) nurse Daley's and counselor Wines' examination findings indicating that

Varitek had normal thought process, intact memory, normal attention, and normal concentration;

(3) treatment notes indicating that Varitek had improved and could adequately manage her

symptoms with medication, therapy, and dietary changes.  (Tr. 339–40, 342, 353, 370–71, 379–

80, 393, 397, 400–01, 409, 430, 441, 451, 481 510, 545, 547, 578).  The ALJ's conclusion that

Dr. Price's opinion was conclusory and on a checklist form was also supported by evidence,

including that the opinion form did not include any space for Dr. Price to explain his opinion and

Dr. Price merely indicated that his opinion was based on Varitek's general diagnoses of

depressive disorder, attention deficit disorder, and generalized anxiety disorder.  (Tr. 692).

Although other evidence in the record could have supported Dr. Price's opinion, the existence of

such evidence does not permit this court to overturn the Commissioner's decision if it was

reasonably drawn from the record.  *Elam*, 348 F.3d at 125; *Rogers*, 486 F.3d at 241.  Thus,

because the ALJ's reasons for rejecting Dr. Price's opinions were reasonably drawn from the

record, the ALJ's decision to give Dr. Price's opinion little weight fell within the

Commissioner's "zone of choice." *Elam*, 348 F.3d at 125; *Rogers*, 486 F.3d at 241; *Mullen*, 800 F.3d at 545. I recommend the court affirm the Commissioner's decision to give Dr. Price's opinion little weight.

### D. Consultative Examiner's Opinion

Varitek argues that the ALJ failed to apply proper legal procedures in evaluating psychological consultant Bousquet's opinion. ECF Doc. 14 at 10–13. Specifically, Varitek asserts that the ALJ failed to explain why he did not include in the RFC any limitations accounting for Bousquet's finding that Varitek was likely to have difficulty responding appropriately to workplace stress and pressure. *Id.* Varitek contends that, because the ALJ gave Bousquet's opinion great weight, the ALJ was required to explain the conflict between her opinion and the RFC. *Id.*

The Commissioner responds that the ALJ did not err in evaluating Bousquet's opinion. ECF Doc. 15 at 15–16. The Commissioner asserts that the ALJ was not required to adopt all of Bousquet's purported limitations in his RFC finding. *Id.* at 16. Nevertheless, the Commissioner argues that the ALJ's RFC finding was consistent with Bousquet's opinion regarding Varitek's ability to respond to workplace stress and pressure. *Id.* Thus, there was no conflict between the RFC and Bousquet's opinion that the ALJ was required to explain. *Id.*

Varitek replies that the Commissioner's argument – that the ALJ did account for Bousquet's opinion regarding her ability to appropriately respond to workplace stress and pressure – is an improper *post hoc* rationalization. ECF Doc. 16 at 4. She asserts that the ALJ had a duty to explain how he crafted the RFC, and that there is "no way of knowing whether the ALJ credited this limitation, discredited this limitation, or simply overlooked it entirely." *Id.*

As discussed above, at Step Four, an ALJ must weigh every medical opinion that the Social Security Administration receives. 20 C.F.R. § 404.1527(c). "Even [when] an ALJ

provides 'great weight' to an opinion, there is no requirement that an ALJ adopt [a medical source's] limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015) (unpublished).  So long as the ALJ's RFC determination considered the entire record, the ALJ is permitted to make necessary decisions about which medical findings to credit and which to reject in determining the claimant's RFC.  *See Justice v. Comm'r of Soc. Sec.*, 515 F. App'x 583, 587 (6th Cir. 2013) (unpublished) ("The ALJ parsed the medical reports and made necessary decisions about which medical findings to credit, and which to reject.  Contrary to [the claimant's] contention, the ALJ had the authority to make these determinations.").  Nevertheless, an ALJ improperly "cherry-picks" evidence when his decision does not recognize a conflict between the functional limitations described in a medical opinion and the ALJ's RFC finding, and explain why he chose to credit one portion over another.  *See Rogers v. Comm'r of Soc. Sec.*, No. 5:17-cv-1087, 2018 U.S. Dist. LEXIS 68715 *44 (N.D. Ohio 2018) (citing *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013)); *see also Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (stating that, if a medical source's opinion contradicts the ALJ's RFC finding, the ALJ must explain why he did not include the limitation in his RFC determination).

The ALJ applied proper legal procedures in evaluating Bousquet's opinion.  42 U.S.C. § 405(g); *Elam*, 348 F.2d at 125.  Although the ALJ gave "great weight" to Bousquet's consultative examiner opinion, the ALJ was not required to adopt all of the limitations in Bousquet's opinion.  *Reeves*, 618 F. App'x at 275; (Tr. 26).  The ALJ satisfied the regulations when he considered the medical evidence as a whole and made necessary decisions about which medical findings to credit and reject in determining Varitek's RFC.  *Justice*, 515 F. App'x at 587; (Tr. 25–27).  Furthermore, Varitek's argument – that the ALJ did not adequately explain the conflict between his ultimate RFC finding and Bousquet's opinion that Varitek would have

difficulty responding appropriately to workplace stress and pressure – is unavailing.  Here, the ALJ's RFC finding did not conflict with Bousquet's opinion, but incorporated it by limiting Varitek to "low-stress environment[s] with no production line or assembly line pace," "no independent decision-making responsibilities," "minimal changes in the daily work routine," and "no more than occasional interaction with co-workers and supervisors."  (Tr. 24).  Thus, there was no conflict between the RFC and Bousquet's opinion that the ALJ was required to explain.  *Rogers*, No. 5:17-cv-1087, 2018 U.S. Dist. LEXIS 68715 *44; *Minor*, 513 F. App'x at 435; *Fleischer*, 774 F. Supp. 2d at 881.  I recommend that the court affirm the ALJ's evaluation of Bousquet's opinion.

### E.  Residual Functional Capacity & Disability Assessment

Varitek argues that the ALJ's RFC finding did not adequately account for her need to take frequent restroom breaks; her problems with concentration, persistence, and pace; and the other impairments that the ALJ found were non-severe at Step Two.  ECF Doc. 14 at 11, 13–17, 19–20.  Varitek asserts that evidence, including the state agency consultants' and Dr. Price's opinions, showed that her mental impairments caused limitations in concentration, persistence and pace, but the RFC did not "accurately and fully convey her limitations."  *Id.* at 13–14.  She contends that, while the ALJ accounted for her need for "a low-stress environment with no production or assembly line type of pace . . . [,] no independent decision-making responsibilities[,] . . . minimal changes in the daily work routine[, and] work involving only routine and repetitive instructions and tasks," the ALJ did not acknowledge that Varitek "may be unable to stay alert, or work at a consistent pace, even at a simple, unskilled, routine job, especially when placed under workplace stress and pressure."  *Id.* at 14–15.  Furthermore, Varitek argues that the ALJ failed to include limitations for frequent restroom breaks to account for her inflammatory bladder disease and interstitial cystitis.  *Id.* at 15–17.  Varitek asserts that

the ALJ was required to make a specific finding concerning the frequency and duration of her restroom usage.  *Id.* at 17.  Finally, Varitek asserts that the ALJ's RFC errors made the hypothetical questions to the VE inadequate to support a not disabled finding, and that the VE's testimony would have supported a disability finding if the RFC accurately reflected her limitations.  *Id.* at 15, 17.

The Commissioner responds that the ALJ properly considered all the relevant evidence in determining that Varitek could perform a range of medium work and was not disabled.  ECF Doc. 15 at 8.  The Commissioner argues that the ALJ's RFC finding adequately accounted for her physical impairments, and that substantial evidence supported the ALJ's decision not to include greater limitations based on her physical impairments.  *Id.* at 8–9; *see also id.* at 10–12 (arguing that substantial evidence supported the ALJ's decisions to credit Dr. Cacchillo's and Dr. Torello's opinions that Varitek could perform medium work, and reject Dr. Wright's, Dr. Purewal's, and Dr. Lawton's opinions that Varitek could perform only sedentary work).  The Commissioner also asserts that no physician limited Varitek to frequent bathroom use, and that Varitek's own subjective complaints alone were insufficient to support a finding that her bladder issues affected her ability to work.  *Id.* at 9.  Further, the Commissioner contends that the ALJ adequately evaluated Varitek's mental impairments, and appropriately accounted for her limitations in concentration, persistence, and pace.  *Id.* at 13–15, 18–20.

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. § 404.1520(e).  The RFC is an assessment of a claimant's ability to do work despite her impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 61 Fed. Reg. 34474, 34475 (July 4, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by *all* of an individual's impairments, even those that are not 'severe.'"

SSR 96-8p, 61 Fed. Reg. at 34477.  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. § 404.1529(a).

At the final step of the sequential analysis, the burden shifts to the Commissioner to produce evidence supporting the contention that the claimant can perform a significant number of jobs in the national economy.  *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002); 20 C.F.R. § 404.1520(a)(4)(v).  An ALJ may determine that a claimant has the ability to adjust to other work in the national economy by relying on a vocational expert's testimony that the claimant has the ability to perform specific jobs.  *Howard*, 276 F.3d at 238; *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(a), (d) (noting that the medical-vocational guidelines do not direct a conclusion of disabled or not disabled when a claimant cannot perform the full range of a category of work).  A vocational expert's testimony in response to a hypothetical question is substantial evidence when the question accurately portrays the claimant's RFC.  *See Howard*, 276 F.3d at 238 (stating that "substantial evidence may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments" (internal quotation marks omitted)); *see also Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 715 (6th Cir. 2013) (unpublished) (stating that the ALJ's hypothetical question must "accurately portray[] a claimant's vocational abilities and limitations").  "An ALJ is only required to incorporate into a hypothetical question those limitations he finds credible."  *Lee*, 529 F. App'x at 715; *see also Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) ("If the hypothetical question has support in the record, it need not reflect the claimant's unsubstantiated complaints.").

The ALJ applied proper legal procedures in evaluating Varitek's RFC.  42 U.S.C. § 405(g); *Elam*, 348 F.2d at 125.  Here, the ALJ complied with the regulations by considering all of Varitek's physical and mental impairments – including Varitek's complaints regarding her interstitial cystitis and frequent restroom usage, concentration, persistence, and pace issues; and her various nonsevere physical impairments – in light of the medical evidence and Varitek's subjective testimony.  20 C.F.R. §§ 404.1520(e), 404.1529(a); SSR 96-8p, 61 Fed. Reg. 34477; (Tr. 24–27).

Substantial evidence also supported the ALJ's RFC assessment.  42 U.S.C. § 405(g); *Elam*, 348 F.2d at 125.  Here, evidence in the record supported the ALJ's decision not to include greater limitations based on Varitek's interstitial cystitis, bladder issues, and frequent restroom usage, including notes indicating that Varitek's gastrointestinal and bladder issues had been reduced through medication and dietary changes.  (Tr. 339–40, 342, 344, 353, 411, 414, 503, 599, 603, 605, 618, 637, 639, 641, 649, 651–55).  Furthermore, Varitek did not produce any medical opinion evidence indicating that her frequent restroom usage caused any functional limitations.  20 C.F.R. § 404.1512(a); *see generally* (Tr. 69–75, 84–90, 377–84, 692–95) (medical opinion evidence lacking any limitations based on frequent restroom usage).  Evidence also supported the ALJ's decision not to include additional limitations based on Varitek's concentration, persistence, and pace problems, including: (1) Varitek's statements that she could watch TV and write articles; (2) nurse Daley's, nurse Slater's, and counselor Wines' examination findings indicating that Varitek had normal thought process, intact memory, normal attention, and normal concentration; (3) Dr. Savitscus' and Dr. Warren's opinions that Varitek had only moderate concentration and pace limitations; and (4) treatment notes indicating that Varitek improved and could adequately manage her symptoms with medication, therapy, and dietary changes when she was compliant with treatment.  (Tr. 73–74, 84–89, 339–40, 342, 344, 347–53,

380, 386–405, 409, 418–28, 441, 451, 481, 510, 636, 538, 545, 547, 554, 560–63, 578–81, 586–89). The ALJ also controlled for Varitek's concentration, persistence, and pace issues by limiting her to non-production rate work, no decision-making responsibilities, only routine and repetitive tasks, and infrequent interpersonal interaction. (Tr. 24). Finally, evidence supported the ALJ's decision not to include additional limitations based on Varitek's various nonsevere impairments, including: (1) Varitek's own statements that she could perform chores and "aggressive workouts"; (2) notes indicating that Varitek had a normal gait, motor strength, and range of motion; (3) Dr. Cacchillo's and Dr. Torello's opinions indicating that Varitek did not have more than moderate physical limitations and could perform medium work; and (4) notes indicating that Varitek's physical symptoms could be conservatively treated through medication, dietary changes, cryotherapy, and chiropractic manipulation. (Tr. 69–72, 75, 84, 86–87, 90, 339–40, 342, 344, 347–53, 362–63, 411, 414, 508, 669–73, 677–81). Thus, the ALJ's decision not to include additional limitations based on Varitek's interstitial cystitis, frequent urination, various nonsevere physical impairments, and problems with concentration, persistence, and pace was reasonably drawn from the record.

The ALJ also applied proper legal procedures and reached a decision supported by substantial evidence when he found that Varitek was not disabled at a Step Five. The ALJ properly relied upon the VE's testimony in determining whether Varitek was disabled, because Varitek was not able to perform the full range of medium work. *Howard*, 276 F.3d at 238; 20 C.F. R. Pt. 404, Subpt. P, App. 2 § 200.00(a), (d); (Tr. 28–29). Further, because the ALJ's hypothetical question reflected his ultimate RFC determination, the VE's testimony that Varitek could work as a kitchen helper, machine packager, and cleaner II was substantial evidence to support the ALJ's conclusion that Varitek was not disabled. *Howard*, 276 F.3d at 238; *Lee*, 529 F. App'x at 715; (Tr. 24, 58–59, Here, the ALJ was not required to include in his hypothetical

question any limitations beyond those that he included in his RFC determination.  *Lee*, 529 F. App'x at 715; *Blacha*, 927 F.2d at 231.

Because the ALJ applied proper legal procedures and reached a decision supported by substantial evidence in evaluating Varitek's RFC and determining that she was not disabled, I recommend that the court affirm the ALJ's RFC and conclusion that Varitek was not disabled.

## VI.  Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Varitek's application for DIB be AFFIRMED.

Dated: April 23, 2019

Thomas M. Parker
United States Magistrate Judge

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).